**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**FRANCISCO MARIN, et al.,**

    **Plaintiffs,**

    **v.**

**PEDRO TOLEDO, et al.,**

    **Defendants.**

**Civil No. 08-1369 (ADC)**

## OPINION AND ORDER

Plaintiffs, Francisco Marín ("Marín"), his wife Norma Ferrer-Chardón ("Ferrer") and their Conjugal Partnership (collectively "plaintiffs") filed this complaint action against the Puerto Rico Police Department ("PRP") Superintendent Pedro Toledo-Dávila ("Toledo"), PRP Commander José Morales-Vázquez ("Morales"), PRP Auxiliary Superintendent of the Illegal Firearms Bureau Francisco Carbo ("Carbo"), PRP Director of the Illegal Firearms Investigation Bureau Andrés Rosas ("Rosas"), PRP Officer Luis Cruz ("Cruz"); PRP Case Analyst for weapon's registry Nelson Cortés ("Cortés"), PRP Officer Mr. Sonia Sánchez [sic] ("Sánchez"); PRP Officer Alejandro Márquez ("Márquez"), PRP Officer Edier Tirado ("Tirado"), PRP Sergeant Julio Andino ("Andino"), each in their individual and official capacity.

Plaintiffs allege, *inter alia*, violations of civil rights, obstruction of justice, obstruction of criminal investigations and obstruction of local law enforcement. **Docket No. 1**.[1] Said claims are brought pursuant to section 1983 and section 1988 of Title 42 of the United States Code ("section 1983" and "section 1988"), for violations of the Second, Fourth, Fifth and Fourteenth amendments; the Racketeer Influenced and Corrupt Organizations Act ("RICO");

---

[1] Plaintiff also filed suit against Iván Pagán, an attorney, and Luis Landestoy, a doctor in medicine. **Docket No. 1.** Further, the court dismissed without prejudice the claims against Landestoy, Rosas, and Andino since the record was devoid of any evidence that process was served since the issuance of summons on March 31, 2008. **Docket No. 43.**

and, under the Commonwealth of Puerto Rico's ("Commonwealth") tort statute.

Before the court is Toledo, Márquez, Sánchez and Carbo's (collectively "defendants") motion to dismiss the complaint ("motion to dismiss") pursuant to Fed. R. Civ. P. 12(b)(6). **Docket No. 29**.[2] Further, Morales, Andino and Cortés requested to join defendants' motion to dismiss. **Docket No. 39**.[3] The court granted the same. **Docket No. 43.** Plaintiffs oppose dismissal. **Docket No. 30.**

At issue now is: (1) whether plaintiffs failed to state a section 1983 claim against defendants for Second, Fourth, Fifth and Fourteenth Amendment violations; (2) whether Toledo is entitled to qualified immunity; and (3) whether Commonwealth tort claims should be dismissed. After due consideration, defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**.

I.  **Factual Background**

Unless otherwise noted, the relevant allegations are derived from the complaint filed on March 28, 2008. **Docket No. 1**.

Plaintiffs allege that, on or around May 1, 2001, Marín suffered an accident while visiting the law offices of Attorney Iván Pagán ("Pagán"). *Id.* at ¶ 16. On that same day, Pagán directed Marín to seek medical care with his friend Dr. Luis Landestoy-Zapata. *Id.* at ¶ 17. While at the doctor's office, Marín suffered a second accident. He hit his head on a sign

---

[2] Said motion also requested to join the arguments expressed in Landestoy's motion to dismiss at **Docket No. 9**. However, in light of the fact that Landestoy's motion only relates to his individual liability, as the doctor who allegedly assaulted Marín, and had both criminal and civil complaints filed against him in Commonwealth courts, the court denies defendants' motion to join. The court further notes that defendants request dismissal of the entire complaint; however, they do not argue dismissal of plaintiffs' section 1988 or RICO claims. Therefore, the court will not address the merits, or lack thereof, of the same.

[3] The collective term "defendants" will also refer to the co-defendants who joined the defendants' motion to dismiss.

on the office's doorway.  When Marín advised Dr. Landestoy of the accident, the Dr. Landestoy attacked Marín.  Marín filed a police report regarding this incident and police officers were called to Marín's aid.  *Id.* at ¶¶ 18, 19.

On November 24, 2004, grievances were filed against Pagán in the Commonwealth Superior Court regarding these incidents.  Also, grievances were filed against Dr. Landestoy with the Medical Physician's Board.  *Id.* at ¶ 20.  Pagán promoted an illegal investigation with PRP's Illegal Firearms Investigation Bureau.  *Id.* at ¶ 21.  Pagán falsely indicated to the police that he was worried about his personal safety due to the numerous firearms Marín owned.  *Id.* at ¶ 22.  This provoked the initiation of criminal charges and an administrative investigation which, according to plaintiff, was aimed at revoking Marín's firearms permit and the confiscation of his firearms collection.  *Id.* at ¶ 23.  Pagán was one of the few who knew of the extent of Marín's firearms collection and he gave the police's investigative unit, Marín''s personal mobile phone, that he used for urgent communications.  Marín claims he was contacted and harassed several times at the mobile number by numerous police agents and other unidentified individuals.  *Id.* at ¶ 24.  Officer Cruz, whom according to plaintiff had a close relationship with Pagán, initiated and promoted a false investigation and criminal prosecution against Marín in April 2006.  *Id.* at ¶ 25.  On February 21, 2006, Pagán sent a letter through the U.S. mail to Superintendent Toledo, falsely charging Marín with threatening his life on May 21, 2001.  *Id.* at ¶ 27.  On February 28, 2006, Pagán also sent a letter through the U.S. mail to the Director of Firearms Licensing Division, falsely stating that Marín kept a stash of illegal firearms in his house.  *Id.* at ¶ 28.

On April 4, 2006, Cruz called Marín and told him that he needed to surrender his firearms and update his firearms permit.  *Id.* at ¶ 29.  On April 5, 2006, and April 10, 2006, Cruz called plaintiffs, indicating that he needed to go to their residence to verify that their firearms had the corresponding updated permits.  *Id.* at ¶ 30.  According to Marín, on April 11, 2006, Cruz provided a false sworn statement in order to obtain an order to search and seize

Marín's firearms. Cruz indicated that Marín had threatened his life and had personal knowledge that Marín kept an arsenal of illegal firearms in his house. *Id.* at ¶ 31. Plaintiff understands Cruz made these statements with the purpose of obstructing the administrative investigation on Marín's firearms' permit renewal and in support of a false criminal complaint. *Id.* at ¶ 32.

On April 2006, separate criminal charges were filed and prosecuted against Marín regarding his alleged possession of illegal firearms. *Id.* at ¶ 34.[4] On April 19, 2006, Marín was arrested and deprived of liberty without probable cause. His arrest was effected with excessive force and Marín required medical attention upon his arrival to the Arecibo jail. *Id.* at ¶ 35. That same day, Superintendent Toledo made false statements on television that Marín's firearm collection had been confiscated due to the fact that plaintiff had threatened the life of police officers and resisted arrest during a search and seizure operation. *Id.* at ¶ 36. On April 19, 2006, Cruz again threatened to initiate criminal charges against the repository manager and employees for refusing to turn over the firearms. The repository officers surrendered the weapons. *Id.* at ¶ 38.[5]

On December 19, 2006, a hearing was held in one of the criminal matters pending against plaintiffs in which plaintiffs reinstated their request for certain materials that were kept by the PRP and that established the falsehood of the alleged threat made by the plaintiff in this case. *Id.* at ¶ 40. On December 20, 2006, the Tactical Operations Division of the PRO broke into plaintiff's home, indicating they had instructions to go inside their residence and

---

[4] Although unclear from the allegations in the complaint, it appears that the last criminal case was dismissed on March 28, 2007. *Id.*

[5] Marín understands that Cruz threatened the repository staff with the filing of criminal charges against them for allegedly aiding and abetting the possession of the allegedly illegal firearms. *Id.* at ¶ 39. Due to this undue pressure, Marín further understands that Cruz coerced and got the repository managers to change their version of the events that occurred during the seizure of the firearms.

search for illegal firearms. *Id.* at ¶ 41. On January 2007, Cortés required that the plaintiff submit to a psychiatric evaluation prior to the issuance of a firearms permit. Later, upon plaintiffs' objection, the same was modified to request a clean bill of health. *Id.* at ¶ 43.

Plaintiffs had always kept their licenses and permits up to date and had an excellent relationship with the individuals involved with the evaluation and consideration of those permits and renewals. *Id.* at ¶ 43. Plaintiffs understand that the objective of these investigations was to promote a criminal case against them, confiscate their firearms, and provoke the administrative revocation of their licences and permits to acquire and possess firearms and ammunition. *Id.* at ¶ 44. Despite the regional limitations in Cruz's position, Cruz wanted to supervise the investigation and obtained Toledo's approval to supervise said investigation. *Id.* at ¶ 45. Plaintiffs contend that Cruz implemented a pattern of persecution that included "the fabrication of a false complaint, a false administrative complaint and report, breaking into the plaintiff's home, attempting to confiscate his firearms without a prior hearing or opportunity to refute the allegations set forth in the complaint, the promotion of a probable cause hearing against plaintiff Marín on criminal charges for the possession of illegal firearms and felony threat." *Id.* at ¶ 46. Further, plaintiff states that Cruz exercised undue pressure over the PRP administrative office and elongated the investigative procedure, aimed to give Pagán the opportunity to intervene, in order to frustrate the renewal of the plaintiff's firearms licenses and permits. Agent Cortés also joined in the pattern of undue influences and interferences. *Id.* at ¶¶ 49, 50. Plaintiff alleges that, upon information and belief, defendants accepted money and personal favors in exchange for conducting such investigations. *Id.* at ¶ 48. Defendants Márquez, Sánchez, Carbó, Reyes, Cortés and Tirado were involved "in the process of hiding relevant information, fabricating documents to improperly charge the plaintiffs with the renewal of the plaintiff's firearms licenses and permits; impeding the paper flow of the administrative investigations that occur as part of such process." *Id.* at ¶ 51.

Civil No. 08-1369 (ADC) Page 6

Plaintiffs complained to the PRP Superintendent Toledo against the officers for their undue behavior and pressure. However, Toledo ordered the investigations should continue. *Id.* at ¶ 52. On or about March 28, 2007, all criminal cases defendants prosecuted against plaintiffs were dismissed. *Id.* at ¶ 54. In April 2007, plaintiffs observed that, upon their appearance at the PRP headquarters to complete the processing of all applicable permits and licenses, their house was watched and their permits were interfered with by the PRP officers, with Toledo's approval. *Id.* at ¶ 53. Plaintiffs state that they continue to be subject to improper involvement and undue pressure from the PRP in pattern violations of their civil rights. *Id.* at ¶¶ 55, 56.

## II. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

In evaluating a motion to dismiss under Rule 12(b)(6), the court "take[s] as true all well-pleaded allegations and draw[s] all reasonable inferences in the plaintiff's favor." *Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 5-6 (1st Cir. 2006). The inquiry is therefore limited to facts alleged in the complaint, incorporated into the complaint, or susceptible to judicial notice. *See In re Colonial Mortgage Bankers Corp.*, 324 F. 3d 12, 15 (1st Cir. 2003); *Young v. Lepone*, 305 F. 3d 1, 11 (1st Cir. 2002) ("The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint."). "The court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, however, nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." *Cordero-Hernández v. Hernández-Ballesteros*, 449 F.3d 240, 244 n.3 (1st Cir. 2006). However, plaintiff "must allege 'a plausible entitlement to relief.'" *Rodríguez-Ortíz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007) (*citing Bell Atl. v. Twombley*, 550 U.S. 544 (2007)).

## III. Discussion

### A. Section 1983 Claim

Plaintiffs bring the present action under section 1983. It is well settled that section 1983

creates no independent substantive rights, but rather, provides a cause of action by which individuals may seek money damages for governmental violations of rights protected by federal law. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). Section 1983 applies to the Commonwealth of Puerto Rico and its instrumentalities with the same force as to any state. *See Deniz v. Mun. of Guaynabo,* 285 F.3d 142, 146 (1st Cir. 2002); *Martínez v. Colón,* 54 F.3d 980, 984 (1st Cir. 1995).

In order to sustain an action under section 1983, a plaintiff must establish that: (I) the conduct complained of was committed under color of state law[6] and (ii) the conduct worked a denial of rights secured by the Constitution or laws of the United States. *See Cepero-Rivera v. Fagundo*, 414 F.3d 124, 129 (1st Cir. 2005); *Collins v. Nuzzo*, 244 F. 3d 246, 250 (1st Cir. 2001); *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001). A plaintiff must show that there is an actual causal connection linking the defendants' conduct to the alleged deprivation. *See Gutiérrez-Rodríguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989). To establish a "but for" causal connection, the plaintiff must show that the defendant was personally involved in the constitutional violation, *see Monell v. Department of S.S.*, 436 U.S. 658, 694 n.58 (1978), and that the conduct was either intentional, grossly negligent, or amounted to reckless indifference to the plaintiff's constitutional rights. *See Simmons v. Dickhaut*, 804 F.2d 182, 185 (1st Cir. 1986).

Defendants move to dismiss all of plaintiffs' section 1983 claims for failure to state a claim. We will analyze whether the four corners of the complaint, as summarized above, hold a plausible section 1983 claim under the Second, Fourth, Fifth and Fourteenth Amendment.

**B.     Second Amendment Claim**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.   The United States Supreme Court, in *District of Columbia v. Heller*, ---

---

[6] For section 1983 liability purposes, "a state employee generally acts under color of state law when, while performing in his official capacity or exercising his official responsibilities, he abuses the position given to him by the State." *West v. Atkins,* 487 U.S. 42, 49 (1988).

Case 3:08-cv-01369-BJM   Document 46   Filed 03/16/09   Page 8 of 14

Civil No. 08-1369 (ADC)                                                                                                       Page 8

U.S. ---, 128 S. Ct. 2783 (2008) recently held that the District of Columbia's complete prohibition on the possession of usable handguns in an individual's home violated the Second Amendment. However, the right to bear arms afforded by the Second Amendment is not absolute. *Gardner v. Vespia*, 252 F.3d 500, 503 (1st Cir. 2001)(*quoting United States v. Miller*, 307 U.S. 174, 178 (1939) (holding that Second Amendment does not invalidate limitations on firearms that do not have a reasonable relationship to a well-regulated militia); *U.S. v. Fincher*, 538 F.3d 868 (8th Cir. 2008), *reh'g and reh'g en banc denied*, *cert. denied*, --- S.Ct. ---, 77 U.S.L.W. (Feb. 23, 2009)(defendant's possession of firearms was not reasonably related to a well regulated militia, and thus not protected by the Second Amendment since defendant was not a member of an organized state militia); *Young v. Hawaii*, 548 F. Supp. 2d 1151 (D. Hawaii 2008)(applicant's denial of a license to carry a firearm did not constitute an injury sufficient to confer standing to challenge violations under the Second Amendment); *see also Walczyk v. Rio*, 339 F. Supp. 2d 385 (D.Conn. 2004), *aff'd in part and rev'd in part on other grounds* (police did not violate Second Amendment when owner of legal gun collection was arrested for threatening, and his house searched for weapons; finding there was no private right of action under the Second Amendment, unrelated to maintenance of militia); *United States v. Miller*, 307 U.S. 174, 178 (1939).

Therefore, although the Second Amendment guarantees "the individual right to posses and carry weapons in case of confrontation," *Heller*, 128 S. Ct. at 2792, the court concludes that the four corners of the complaint do not hold a valid claim for such a violation. Apparently, Marín was subject to administrative investigations and the PRP officers were insistent on the renewal of their gun permits. Also, around the time of his gun permit renewals, Marín had criminal charges pending that were later dismissed. Plaintiffs have not demonstrated that defendants abridged their right to bear arms. They do not allege their gun permits were, in fact, revoked, suspended, denied or that he was otherwise thwarted of his right to bear arms. These allegations do not amount to a Second Amendment violation. As noted above, the right to bear arms is not an absolute and unfettered right. In addition, plaintiffs' allegations do not

aver that they, in fact, were denied the right to bear arms at any moment.[7]  Accordingly, plaintiffs' Second Amendment claims are **DISMISSED WITH PREJUDICE**.

### C. Fourth Amendment

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  Plaintiffs' Fourth Amendment rights are only implicated if defendants' conduct infringed "an expectation of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega,* 480 U.S. 709, 715 (1987) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)). Additionally, the Fourth Amendment offers protection against the excessive use of force in the course of an arrest.  Thus, the Fourth Amendment commands Government officials to conduct only those searches and seizures of persons or property which are reasonable. Further, for a state actor to violate the Fourth Amendment by initiating a malicious prosecution against someone, the criminal charges at issue must impose some deprivation of liberty consistent with a 'seizure'.  *Britton v. Maloney*, 196 F.3d 24, 28 (1st Cir. 1999).

Upon review of plaintiffs' complaint, they have alleged a plausible Fourth Amendment claim.  The complaint states Marín was arrested and deprived of liberty without probable cause and the PRP used excessive force to arrest him, which required medical attention. **Docket No. 1** at ¶ 35.  It also states that the PRP broke into plaintiffs' home to search for illegal firearms.  *Id*. at ¶ 41. As highlighted above, plaintiffs allege excessive force in an arrest that was conducted without probable cause. They also state that defendants entered into plaintiffs'

---

[7] Even if plaintiffs' allegations had established that defendants prohibited plaintiffs from bearing arms or had seized his arms unlawfully, an individual's Second Amendment right to keep and bear arms was not clearly established until *Heller*.  Thus, the PRP law enforcement officers would be entitled to qualified immunity on plaintiffs' section 1983 claims that officers violated plaintiffs' Second Amendment rights if they had seized his firearms during the search of his residence.  *See Hope v. Pelzer,* 536 U.S. 730 (2002); *Saucier v. Katz,* 533 U.S. 194, 201 (2001); *Savard v. Rhode Island,* 338 F.3d 23, 27 (1st Cir.2003).

home to search and seize firearms. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002); *see also Twombly*, 127 S.Ct. at 1973-74 (reiterating that Rule 8(a) "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face"). Accordingly, at this juncture, defendants' motion to dismiss plaintiffs' Fourth Amendment claims is **DENIED**.

### D. Fifth Amendment Claim

Next, defendants aver that plaintiffs' Fifth Amendment claim should be dismissed because they fail to allege that the federal government violated their constitutional rights. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law. . . ." U.S. Const. amend. V. It is undisputed that the Fifth Amendment "applies to actions of the federal government." *Gerena v. P.R. Legal Serv. Inc.*, 697 F.2d 447, 449 (1st Cir. 1983) (citing *Public Util. Comm'n v. Pollak*, 343 U.S. 451, 461 (1952)). Notwithstanding plaintiffs' allegations that their Fifth Amendment rights were violated, the fact of the matter is that plaintiffs have failed to either name federal actors or allege facts which suggest any federal actors were responsible for his injuries or the deprivation of his constitutional rights. **Docket No. 1**. As such, defendants' motion to dismiss plaintiffs' Fifth Amendment claim is **GRANTED.**

### E. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment to the United State Constitution "provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). To succeed on procedural due process claim, plaintiff must show that he had a property or liberty interest, and that defendants, acting under color of state law, deprived him of that interest without due process. *See id*. at 538. Moreover, property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd.*

*of Regents v. Roth*, 408 U.S. 564, 577 (1972).

However, the Fourteenth Amendment does not apply to unreasonable searches and seizures or police brutality cases such as the one at bar pleads. These civil action claims are controlled by the Fourth Amendment. G*raham v. Connor,* 490 U.S. 386, 395 (1989) (excessive force claims arising in context of arrest or investigatory stop, or other "seizure" of a free citizen, most properly invoke protections of the Fourth Amendment); *see also Moreta-Ramírez v. Lemert*, 156 F. Supp. 2d 138 (D.P.R. 2001). Thus, plaintiffs' Fourteenth Amendment claims are **DISMISSED WITH PREJUDICE**.

### E. Qualified Immunity

"Qualified immunity 'provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties.'" *Borges-Colón v. Román-Abreu*, 438 F.3d 1, 18 (1st Cir. 2006) (quoting *Whitfield v. Meléndez-Rivera*, 431 F.3d 1, 6 (1st Cir. 2005)). To determine whether a public official is entitled to qualified immunity, the court applies a three part test asking: "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." *Mihos v. Swift*, 358 F.3d 91, 102 (1st Cir. 2004). The Court denies qualified immunity only if all three questions are answered in the affirmative. *Id*. at 110.

"In order to conclude that the right which the official allegedly violated is 'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Further, in determining whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue, "the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *Singer v. Maine*, 49 F.3d 837, 844 (1st Cir. 1995) (citations omitted). In an

excessive force case, the threshold constitutional question is analyzed under the Fourth Amendment's objective reasonableness standard. *See Graham,* 490 U.S. at 394; *see also Whitfield,* 431 F.3d at 7.

Defendants argue Toledo is entitled to qualified immunity because they can not be held liable vicariously for the wrongful acts of an employee under section 1983 because they were not personally involved in the incidents surrounding plaintiffs' allegations. Further, they contend that plaintiffs' have failed to meet the pleading requirements of *respondeat superior* liability for a section 1983 claim by not alleging in the complaint that these defendants failed to instruct, supervise, control, investigate or discipline the officers involved.

Although there is no *respondeat superior* liability under section 1983, *Ayala-Rodríguez v. Rullán*, 511 F.3d 232 (1st Cir. 2005)(citing *Rizzo v. Goode*, 423 U.S. 362, 375-77 (1976)), a supervisor may be liable for his/her own acts or omissions through "the supervisor's direct participation in the unconstitutional conduct or through conduct that amounts to condonation or tacit authorization*." Whitfield*, 431 F.3d at 14 (internal citations omitted). "Absent direct participation, a supervisor may only be held liable where (1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was 'affirmatively link[ed]' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence... amounting to deliberate indifference.'" *Id.* (internal citations omitted).

Regarding the excessive force arrest without probable clause and unreasonable search allegations in plaintiffs' complaint, Toledo did not have any direct participation in plaintiffs' allegations. Therefore, he would only be liable if his subordinates violated plaintiffs' constitutional rights and his inaction was "affirmatively linked" to plaintiffs' constitutional violations. As the complaint stands, Toledo is not linked to plaintiffs' Fourth Amendment claims. Instead, he is linked to plaintiffs' Second Amendment claims regarding their firearms permits and the administrative investigations in regards to their firearms, which have been dismissed. **Docket No. 1** at ¶¶ 36, 45, 48, 49, 52, 53. Therefore, Toledo's request for dismissal

on qualified immunity grounds is **GRANTED** and the supervisory liability claims against him are **DISMISSED WITHOUT PREJUDICE**.

## IV. Supplemental Jurisdiction

Defendants argue that all claims should be dismissed, including the Commonwealth tort claim. **Docket No. 29.** However, as highlighted above, plaintiffs have plead a plausible Fourth Amendment claim. Since their Commonwealth claims spring from the same nucleus of operative facts, the court finds that the federal and Commonwealth claims are part of the same case or controversy for the purposes of 28 U.S.C. § 1367. *BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers of Am., IAMAW Dist. Lodge 4*, 132 F.3d 824, 833 (1st Cir. 1997) ("A federal court that exercises federal question jurisdiction over a single claim may also assert supplemental jurisdiction over all state-law claims that arise from the same nucleus of operative facts.") (citations omitted). Thus, defendants' request that the court dismiss all plaintiffs' supplemental Commonwealth claims is **DENIED**.

## V. Conclusion

Based on the foregoing, defendants' motion to dismiss (**Docket No. 29**) is **GRANTED in part** and **DENIED in part** as follows:

1. Plaintiffs' Second Amendment claims against defendants are **DISMISSED WITH PREJUDICE**;

2. Defendants' request to dismiss plaintiffs' Fourth Amendment claims is **DENIED;**

3. Plaintiffs' Fifth Amendment claims against defendants are **DISMISSED WITH PREJUDICE**;

4. Plaintiffs' Fourteenth Amendment claims against defendants are **DISMISSED WITH PREJUDICE**;

5. Toledo's request to dismiss plaintiffs' claims based upon the Qualified Immunity defense is **GRANTED**;

6. Defendants' request for dismissal of plaintiff's Commonwealth claims is **DENIED**.

**SO ORDERED.**

At San Juan, Puerto Rico this 16th day of March, 2009.

              **S/AIDA M. DELGADO-COLON**
              **United States District Judge**